UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

ERIN PRIMMER,

                                        Plaintiff,

          - against -                                    08-CIV-9422 (HB) (AJP)

CBS STUDIOS, INC.,

                                        Defendant.

-------------------------------------------------------------------X


## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO SUMMARY JUDGMENT MOTION


**REISMAN, PEIREZ & REISMAN, L.L.P.**
Attorneys for Plaintiff
1305 Franklin Avenue
PO Box 119
Garden City, New York  11530
(516) 746-7799

## Table of Contents

**Page**

Table of Authorities ................................................................................................. i

Preliminary Statement ............................................................................................ 1

Background and Facts ............................................................................................. 3

    A.    Ms. Primmer's Commencement as a
            Producer for *The Montel Williams Show* ............................................. 3

    B.    Ms. Primmer's Performance during the 15th Season ............................ 3

    C.    Ms. Primmer's Performance during Season 16 ................................... 8

    D.    Ms. Primmer's Aneurysm .................................................................. 12

ARGUMENT .......................................................................................................... 14

    POINT I

    PLAINTIFF HAS SET FORTH A *PRIMA FACIE* CASE .......................................... 14

    A.    ADA Amendments Act of 2008 ........................................................ 14

    B.    *McDonnell Douglas* Analysis ........................................................... 16

    C.    Plaintiff's *Prima Facie* Case ............................................................ 18

    POINT II

    MS. PRIMMER HAS SET FORTH EVIDENCE WHICH
    WOULD PERMIT A JURY TO DETERMINE THAT
    CBS' PROFFERED NON-DISCRIMINATORY REASON
    FOR NOT RENEWING HER CONTRACT WAS A PRETEXT .............................. 21

Conclusion ............................................................................................................. 25

## Table of Authorities

**Page**

### *Cases*

*Bartlett v. New York State Board of Law Examiners,*
226 F.3d 69 (2d Cir. 2000)..............................................................................20

*Byrnie v. Town of Cromwell Board of Education,*
243 F.3d 93 (2d Cir. 2001)..............................................................................22

*Capobianco v. City of New York,* 422 F.3d 47 (2d Cir. 2005) ...............................19

*Carlton v. Mystic Transportation Inc.,*
202 F.3d 129 (2d Cir. 2000)............................................................................17

*Hicks v. Tech Industries,* 512 F.Supp.2d 338 (W.D.Pa. 2007)...............................19

*Howell v. New Haven Board of Education,* 309 F.Supp.2d 286
(D. Conn. 2004) .....................................................................................17, 20

*Luciano v. Olsten Corp.,* 110 F.3d 210 (2d Cir. 1997)..........................................17

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792,
93 S.Ct. 17 (1973) .......................................................................................16

*Medlin v. Rome Strip Steel Co.,* 294 F.Supp.2d 279
(N.D.N.Y. 2003) .........................................................................................19

*Pikoris v. Mount Sinai Medical Center,* 2000 WL 702987
(S.D.N.Y 2000) ..........................................................................................20

*Raytheon Company v. Hernandez,* 540 U.S. 44, 124 S.Ct. 513 (2003)....................16

*Reeves v. Sanderson Plumbing Products, Inc.,*
530 U.S. 133, 120 S.Ct. 2097 (2000)...............................................................17

*Rodriguez v. Conagra Grocery Products Company,*
436 F.3d 468 (5th Cir. 2006).........................................................................19

*Rosen v. Thornburgh,* 928 F.2d 528 (2d Cir. 1991) .............................................18

*Ryan v. Grace & Rybicki*, 135 F.3d 867 (2d Cir. 1998) ........................................................20

*Schroeder v. Suffolk County Community College*,
    2009 WL 1748869, P6 (E.D.N.Y. 2009) ......................................................15

*Stalter v. Board of Cooperative Educational Services Rockland*
    *County*, 235 F.Supp.2d 323 (S.D.N.Y. 2002) ............................................19

*Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139 (1999).......................14, 15, 18

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248,
    101 S.Ct. 1089 (1981) ...............................................................................17, 22

### *Legal Authorities*

<u>Federal</u>

ADA.................................................................................................................*passem*

ADA Amendments Act of 2008 ..............................................................14, 15, 16

<u>State</u>
*Executive Law* §290 *et seq.*................................................................................1

<u>Local</u>
New York City Administrative Code ......................................................................1

### *Other Authorities*
Ability Magazine, www.abilitymagazine.com/news_ADAAA................................ 16 fn 7

170954

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

ERIN PRIMMER,

                                  Plaintiff,

          - against -                                    08-CIV-9422 (HB) (AJP)

CBS STUDIOS, INC.,

                                  Defendant.

------------------------------------------------------------------X

### PLAINTIFF'S MEMORANDUM OF LAW
### IN OPPOSITION TO SUMMARY JUDGMENT MOTION

#### Preliminary Statement

      Plaintiff, Erin Primmer, commenced this action alleging that defendant CBS

Studios, Inc. ("CBS") violated the Americans with Disabilities Act (42 U.S.C. §12111 *et*

*seq.*, hereinafter "ADA"), New York State Human Rights Law (*Executive Law* §290 *et seq.*)

and the New York City Administrative Code, when CBS refused to renew Ms. Primmer's

employment contract as a producer for *The Montel Williams Show* because Ms. Primmer had

suffered a brain aneurysm and CBS perceived Ms. Primmer to be disabled.  CBS now moves

for summary judgment contending that Ms. Primmer cannot establish a *prima facie* case of

discrimination, and in any event, CBS has come forward with a nondiscriminatory reason

why Ms. Primmer's employment contract was not renewed.

      Specifically, CBS contends that it was Ms. Primmer's poor performance in

fulfilling her obligations as a producer that led to the decision not to renew her contract, and

170954

that the decision not to renew Ms. Primmer's contract was made prior to her aneurysm. CBS' contentions are contradicted through not only Ms. Primmer's affidavit and deposition, but through documentary evidence and inconsistent and contradictory testimony of CBS' own witnesses.

Ms. Primmer was first told that her contract would not be renewed in May 2007, shortly after she had an aneurysm while at work. In addition, during the conversation where Ms. Primmer was told that her contract was not going to be renewed, Ms. Primmer's supervisor, Susan Henry, discussed Ms. Primmer's aneurysm and her rehabilitation, and told Ms. Primmer that CBS needed someone "at the top of their game" and CBS did not feel that Ms. Primmer "could handle the pressure." These statements made by CBS' senior personnel are evidence of CBS' belief that because of Ms. Primmer's aneurysm she was too fragile to handle the stress of a job. Accordingly, Ms. Primmer has fulfilled the *de minimis* task of establishing a *prima facie* case of discrimination.

As to the contention that the decision not to renew Ms. Primmer's contract was a result of her performance, and was made prior to when Ms. Primmer had her aneurysm, the record contains sufficient evidence to allow a jury to determine that CBS' proffered reason was a pretext, including: (a) the contradictory testimony of the senior CBS personnel; (b) the lack of any documentary record reflecting Ms. Primmer's purported lack of performance; (c) the incredulousness of CBS' after-the-fact explanation that a decision had been made prior to the aneurysm when a CBS senior officer testified that typically the decision whether to return a producer would not be made until the end of the season, which would have been

170954

after Ms. Primmer's aneurysm; and (d) the decision was conveyed to Ms. Primmer only after

her condition and the reasons given for her non-renewal related to her physical condition.

Pursuant to well-settled law, Ms. Primmer's *prima facie* case, together with

evidence demonstrating that CBS' proffered reason for the termination was a pretext, raise

triable issues of fact. And, given the nature of the claims and the documentary evidence, or

lack thereof, these factual issues will heavily depend on the jury's determination as to the

credibility of each witness. Accordingly, CBS' motion for summary judgment should be

denied.

### Background and Facts

**A.** ***Ms. Primmer's Commencement as a***
     ***Producer for* The Montel Williams Show**

In August of 2005, plaintiff was hired as a producer for *The Montel Williams*

*Show* and became an employee of CBS through its CBS Paramount Domestic Television

division. At the time her employment began in August of 2005, plaintiff entered into an

employment contract and worked full time for the 15th Season of *The Montel Williams Show*

which ran from August 1, 2005 to May 15, 2006 (*see* Employment Contract, Exhibit A to the

Affidavit of Erin Primmer, sworn to on July 21, 2009, "Primmer Affidavit").

**B.** ***Ms. Primmer's Performance during the 15th Season***

During her first year of employment, plaintiff satisfactorily performed her

duties as a producer. Although CBS now contends that Ms. Primmer's performance during

Season 15 was weak, primarily relying on the self-serving deposition testimony of Montel

Williams, neither of the individuals who were promoted to co- executive producers during

- 3 -

170954

Season 15 and who had immediate supervisory responsibility over Ms. Primmer –Susan

Henry and Kimberly Forman-Brechka – have any recollection whatsoever of Mr. Williams

complaining about Ms. Primmer during that season.

For example, Ms. Forman-Brechka testified:

"Q.    After you became coexecutive producer, did you play a role in supervising Ms. Primmer?

A.    Yes.

**Q.    And during the 2005/2006 season, did you have an opportunity to -- did you form an opinion as to Ms. Primmer's job performance**?

A.    **No**.

**Q.    During the 2005/2006 season when you were coexecutive producer, did you have any discussions with any personnel at The Montel Williams Show with regard to Ms. Primmer's job performance**?

A.    **During that time, I don't believe so**.

**Q.    Okay. And during that period of time, did you have any discussions with Montel Williams about Ms. Primmer's job performance? This is 2005/2006.**

A.    **2005/2006, I don't recall**.

Q.    Was Ms. Primmer's contract renewed for the 2006/2007 season?

A.    Yes, I believe so.

Q.    And did you play any role in making the determination to renew Ms. Primmer's contract for the 2006/2007 season?

A.    Yes.

Q.    And what role did you play?

- 4 -

170954

A.     We agreed to renew her contract.

Q.     Was there any -- when you say 'we,' was that Mr. Williams and Ms. Henry?

A.     Yes.

Q.     And did Mr. Williams express any doubts about rehiring or renewing Ms. Primmer's contract for the 2006/2007 season?

MS. SACK: Objection to form.

A.     I don't recall.

Q.     How about Ms. Henry?

        MS. SACK: Objection to form.

A.     I don't recall." (emphasis supplied) (*see* Forman-Brechka Tr. 19-21).[1]

Similarly, Ms. Henry testified:

> **"Q.     During the 2005/2006 season while you were coexecutive producer, did you have any discussions with Mr. Williams regarding Ms. Primmer's job performance**?
>
> **A.     I don't recall.**
>
> **Q.     How about with Ms. Forman-Brechka? I'll lay it out, did you have any discussions with Ms. Forman-Brechka during the 2005/2006 season while you were coexecutive producer regarding the performance of Erin Primmer**?
>
> **A.     I don't recall.**

---

[1]     Transcript references are contained in the following exhibits to the Primmer Affidavit:  Forman-Brechka, Exhibit D; Henry, Exhibit C; Williams, Exhibit J; Jewett, Exhibit G; Villapol, Exhibit F; and Borruso, Exhibit I.

170954

Q.    **Did there come a time where there were discussions as to whether or not Ms. Primmer's contract should be renewed for the 2006/2007 season**?

A.    **Yes**.

Q.    **When did those discussions take place**?

A.    **I believe shortly before the season was ending**.

Q.    And when does the season end?

MS. SACK: Objection to form.

Q.    When did the season end -- when you say the season ended, are you talking about the 2005/2006 season?

A.    Yes.

Q.    **And when does -- when did the 2005/2006 season end**?

A.    **Late April, early May**.

Q.    And who did you have the discussions with with regard to renewing Ms. Primmer's contract?

A.    Kim Forman-Brechka.

Q.    Anybody else?

A.    Montel Williams.

Q.    Anybody else?

A.    Peter Villapol.

Q.    Anybody else?

A.    That's all I recall at this time.

Q.    Did any of those three individuals, Kim Forman or Williams or Peter Villapol suggest that Ms. Primmer's

170954

contract should not be renewed for the 2006/2007
season?

A.    I don't recall.

Q.    Did you ever suggest that her contract should not
be renewed for the 2006/2007 season?

A.    I don't recall." (emphasis supplied) (Henry
Tr. 18-20; *see also* Henry Tr. 23-24).

In addition, CBS's contention regarding Ms. Primmer's performance during

Season 15 is devoid of any documentary support whatsoever.  In fact, CBS cannot point to a

single piece of paper – not a memo, letter, note or email – that remotely suggested that Ms.

Primmer did not fulfill her obligations as producer during 2005-2006.  To the contrary, Ms.

Primmer was provided with a reference by Peter Villapol, the Executive in Charge of

Production, which stated that Ms. Primmer's "prospects for continued employment and

advancement are excellent" (*see* Exhibit B to Primmer Affidavit).

And, most tellingly, CBS and plaintiff negotiated a new contract for the

following season which was scheduled to begin on or about August 1, 2006 (*see* Exhibit H to

Primmer Affidavit).  These negotiations involved CBS' acquiescence to Ms. Primmer's

demand for a higher salary for Season 16 (*see* Exhibit H to Primmer Affidavit; *see also*

Villapol Tr. 27-29).  Why, if Ms. Primmer was such a bad producer, would CBS enter

negotiations to pay her a higher salary?[2]

---

[2]    Mr. Williams explained his decision to renew Ms. Primmer's contract by stating
everyone "gets a pass" during their first year.  This is not quite true.  In fact, Joanne
Paredis was hired as a producer during the middle of Season 16 and not renewed for
Season 17 (Primmer Affidavit, ¶ 10; *see also* Forman-Brechka Tr. 55-57).

170954

Thereafter, an employment agreement was entered into between Primmer and CBS where she would be employed as a producer from August 1, 2006 through the end of the season, May 18, 2007. However, Ms. Primmer's employment agreement provided intervals where CBS could terminate Ms. Primmer's employment during that season without any necessity to pay her severance. (Primmer Affidavit, ¶11; *see also* Henry Tr. 53-54).

### C.    *Ms. Primmer's Performance during Season 16*

From the commencement of Season 16 through March 29, 2007, the date of Ms. Primmer aneurysm, Ms. Primmer adequately performed her services as a producer. Again, CBS cannot come forward with a single document from anyone who had supervisory responsibility over her containing any criticism of Ms. Primmer's performance. The only written documentation that CBS could scrounge up is a memo by the Supervising Field Producer who relates a third-hand complaint from a field producer. And, notwithstanding that this memo contains inadmissible hearsay statements, only one paragraph out of five pages even mentions Ms. Primmer (*see* Exhibit M to Sack Declaration).

And, although now CBS contends that Ms. Primmer did her job poorly, during their depositions, Ms. Primmer's supervisors could not come forward with any specific examples when her performance was subpar. For example, Ms. Jewett, who became involved with *The Montel Williams Show* during Season 17, testified:

> "Q.    Ms. Jewett, did you ever have any conversations with Erin Primmer regarding preinterview notes that you felt were deficient?
>
> A.    It's likely, but I don't remember those kinds of specifics.

170954

Q.    Were you ever present where Susan Henry and Kim Forman had discussions with Ms. Primmer regarding the lack of quality of her preinterview notes?

A.    Again, it's likely, but I don't recall any specifics. I just don't.

Q.    Do you recall any conversations where Susan Henry or Kim Forman discussed with you the lack of quality of Erin Primmer's preinterview notes?

MS. SACK: Objection to form.

A.    I don't recall specific conversations.

Q.    Okay. With regard to shot sheets, did you ever have any conversations with Ms. Primmer regarding the quality of her shot sheets?

A.    Again, I don't have specific recollections of specific conversations. I do recall that there were issues with Erin's work on multiple occasions in regards to all the aspects that are involved in putting a show together and producing a show.

*    *    *

Q.    Were you ever present when Kim Forman or Susan Henry had any conversations with Erin Primmer regarding the quality of her shot sheets?

A.    I don't recall.

Q.    Did Ms. Henry or Ms. Forman ever inform you that they had conversations with Ms. Primmer regarding the quality of her shot sheets?

A.    I don't recall."

(*See* Jewett Tr. 93-95; *see also* Jewett Tr. 63-64, 76, 85-87; Henry Tr. 37-38.)

According to Ms. Primmer, the only time that there was any criticism of her performance was after a "pitch" meeting held on January 30, 2007 wherein Ms. Primmer was

- 9 -

170954

directed by Ms. Henry and Ms. Forman-Brechka to more fully develop her ideas for

proposed shows, and resubmit them. Ms. Primmer did so, as Ms. Henry even acknowledges,

and heard no complaints thereafter (Primmer Affidavit ¶¶ 14-15; *see* also Henry Tr. 41).

Further, a non-party former producer of *The Montel Williams Show* testified that Ms.

Primmer was performing her job well during Season 16, often having highly rated shows

(Borruso Tr. 63-64).

CBS essentially hitches its whole defense on this one pitch meeting.

Notwithstanding Mr. Williams' strained testimony that he had decided to terminate Ms.

Primmer prior to January 30, 2007, none of the other CBS executives remembers him

making that directive (*see, e.g.*, Forman-Brechka Tr. 28; Henry Tr. 43-44). Instead,

according to Ms. Jewett, Ms. Henry and Ms. Forman-Brechka, it was Ms. Primmer failure to

give creative pitches during this one meeting which resulted in a decision not to renew her

contract. This contention is absurd.

First, as Ms. Henry clearly testified, the decision whether to renew a

producer's contract normally occurs at the end of the season, *i.e.*, April or May, not January

and February (Henry Tr. 44-45)[3]. Further, all of the parties acknowledge that Ms. Primmer

was not told that her contract would not be renewed until May of 2007, after her aneurysm.

And, although the decision to terminate Ms. Primmer was reportedly made immediately after

the January 30, 2007 pitch meeting, even Ms. Forman-Brechka acknowledged that she gave

---

[3]     As to the other producers whose contracts were not renewed after the 2006-2007
season, defendant's witnesses could not recall when these decisions were made (*see,
e.g.*, Forman-Brechka Tr. 56-59).

- 10 -

170954

Ms. Primmer a chance to improve, although she purportedly still planned on firing her at the

end of the season, testifying:

> "Q.    Was there a decision made?
>
> A.    Yes.
>
> Q.    And what was that decision?
>
> A.    It was to give her another chance to talk to Mr. Williams to see if he would be okay with us giving her another chance and working with her very closely in order to help improve her shows rather than terminating her immediately.
>
> Q.    Did you then have a discussion with Mr. Williams along those lines?
>
> A.    Yes.
>
> Q.    Was Ms. Henry present during that discussion?
>
> A.    Yes.
>
> Q.    And how did Mr. Williams respond?
>
> A.    He understood and told us it was up to us to work with her.
>
> Q.    Did you then meet with Ms. Primmer?
>
> A.    Yes.
>
> Q.    And you discussed the pitches she made at the pitch meeting?
>
> A.    Yes.
>
> Q.    Did you ask her to go back and rewrite some materials?
>
> A.    Yes.

170954

Q.    And did she, in fact, rewrite some materials?

A.    I don't recall."[4]  (Forman-Brechka Tr. 40-41).

Finally, throughout this second season that Ms. Primmer was at the show, there was no time where she was told her performance was lacking, nor were there any reviews indicating that Ms. Primmer was not doing her job.  Further, although Ms. Primmer's contract for Season 16 did provide intervals where she could be let got at no cost to CBS (Henry Tr. 53-54), and although other producers were terminated midseason, Ms. Primmer was not and was only told that her contract would not be renewed **after** her aneurysm.[5]

### D.    Ms. Primmer's Aneurysm

On March 29, 2007, while working for CBS, and while at the set of *The Montel Williams Show*, Ms. Primmer suffered a brain aneurysm, collapsed, and was taken to a nearby medical hospital.  After extensive surgery and recovery, Ms. Primmer survived the aneurysm and regained her strength.  Ms. Primmer was then released from the hospital, began rehabilitation, and was prepared to return to *The Montel Williams Show* for the next season (*see* Primmer Affidavit, ¶¶ 16-19).

---

[4]    Consistent with Ms. Primmer's testimony, Ms. Henry acknowledged Ms. Primmer did rewrite the pitch ideas, improved them, and resubmitted the materials (*see* Henry Tr. 41).

[5]    According to Mr. Williams, one of the producers let go during Season 16 – C.J. Lenant – Mr. Williams had decided on many occasions over the years to terminate, but apparently changed his mind before the producer was actually let go (Williams Tr. 28).

170954

However, in May of 2007, Ms. Primmer was contacted and asked to come in to meet with her supervisor, Susan Henry. Ms. Primmer assumed that this discussion was about the terms of her contract for the next year (Primmer Affidavit, ¶ 17). However, when Ms. Primmer met with Ms. Henry, she was told that CBS was not going to renew her employment contract.[6]

During this meeting, Ms. Henry and Ms. Primmer discussed her aneurysm and recovery, and Ms. Primmer was then told by Ms. Henry that they needed someone "who could handle the pressure" and that was physically "at the top of their game" (Primmer Affidavit, ¶ 18). And, although Ms. Henry flatly denies under oath stating to Ms. Primmer that they needed "someone capable of handling the pressure" (*see* Henry Tr. 73), she is flatly contradicted by CBS' own witness, Peter Villapol, who stated that he was at the meeting and testified:

> "Q.     Prior to this meeting, Ms. Primmer had an aneurysm; is that right?
>
> A.     Yes.
>
> Q.     And you were aware of that at the time of the meeting; is that correct?
>
> A.     Yes.
>
> Q.     Was there any discussions at that meeting with regard to Ms. Primmer's aneurysm?
>
> A.     Yes.

---

[6]     According to CBS, incredulously no one ever mentioned Ms. Primmer's aneurysm – which then admittedly was a traumatic event for those that worked with the show – when they discussed that CBS was going to tell Ms. Primmer that her contract was not going to be renewed (*see, e.g.*, Henry Tr. 76-77).

170954

> Q.    What was said?
>
> A.    She spoke of it and spoke of her recovery.
>
> Q.    Did Ms. Henry say to Ms. Primmer some words to the effect that they needed someone at the top of their game?
>
> A.    Yes.
>
> Q.    Did she state something about needing someone that could handle the pressure?
>
> A.    I don't recall."  (Villapol Tr. 44)

Ms. Primmer made a written complaint to CBS that their failure to renew her contract for the following season of *The Montel Williams Show* was in violation of the ADA, but there was no response and no effort by CBS to investigate the allegation (*see* Exhibit K to the Primmer Affidavit).  Accordingly, Ms. Primmer commenced legal proceedings.

## ARGUMENT

## POINT I

## PLAINTIFF HAS SET FORTH A *PRIMA FACIE* CASE

### A.    *ADA Amendments Act of 2008*

The ADA prohibits adverse employment actions taken against an employee because they are disabled (42 U.S.C. §12112).  Prior to the ADA Amendments Act of 2008 ("ADAAA"), an individual was considered disabled if he or she was regarded as having a physical or mental impairment that substantially limits one or more major life activities, and the ability to work was considered a major life activity (42 U.S.C. §12102[2][c] [pre-ADAAA]).  The Supreme Court, in *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139 (1999), and decisional authority thereafter, limited the definition of substantial

170954

impairment relating to the inability to work to mean that an individual either had to be or was perceived to be prohibited from either a class of jobs, or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.

The ADAAA, Section 2, Findings and Purposes, states that "the holdings of the Supreme Court in *Sutton v. United Air Lines, Inc.,* 527 U.S. 471 (1999) and its companion cases, have narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals Congress intended to protect." The ADAAA then amends the definitions with regard to employment actions taken against an individual regarded as having an impairment, and has stated such acts are actionable if they result from an employer perceiving an individual having "physical or mental impairment, whether or not the impairment limits or is perceived to limit a major life activity," (42 U.S.C. §12102).

Upon this motion, defendant contends that the ADAAA is irrelevant to this case since the Complaint was filed prior to the ADAAA's January 1, 2009 effective date and, as explained below, defendant then relies on *Sutton v. United Air Lines, Inc.* and subsequent decisional authority based on *Sutton* to urge dismissal of this action. Admittedly, although the Second Circuit has not ruled on the retroactive effect of the ADAAA, uniformly Courts have held that the ADAAA should not be applied retroactively (*see Schroeder v. Suffolk County Community College*, 2009 WL 1748869, P6 [E.D.N.Y. 2009] and cases cited therein).

Plaintiff urges the Court to reject these holdings. The ADAAA specifically states that its purpose is to correct the Supreme Court's prior misapplication of the ADA, and

- 15 -

170954

the misreading of the ADA's legislative intent. It is simply anomalous to continue to utilize a statutory interpretation specifically rejected by Congress in overwhelming numbers,[7] and continue to adjudicate ADA claims **not** under superseded statutory language, but under decisional authority interpreting the statute's prior language that has been repudiated by the very legislature that enacted the statute in the first place.

At a minimum, if this Court is to reject the retroactive application of the ADAAA, and utilize the prior ADA language in adjudicating this dispute, it is respectfully requested that this Court should still take into account the congressional admonition that the decisional authority narrowly interpreting the ADA's prior language violated congressional intent. In any case, as explained below, plaintiff can sustain her claims even if the ADAAA is not applied retroactively to this case.

### B.  McDonnell Douglas *Analysis*

Irrespective of the ADAAA, disparate treatment claims under the ADA are analyzed pursuant to the *McDonnell Douglas* burden shifting analysis (*Raytheon Company v. Hernandez*, 540 U.S. 44, 124 S.Ct. 513 [2003]; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 17 [1973]). Under the *McDonnell Douglas* burden shifting analysis, a plaintiff alleging discrimination must come forward with facts setting forth a *prima facie* case, and once this is done, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse employment actions taken against the plaintiff

---

[7]     The House of Representatives passed the ADAAA in June 2008 by a vote of 402-17. The Senate passed a slightly revised version by unanimous consent, and that measure was subsequently approved by the House and signed into law (Ability Magazine, www.abilitymagazine.com/news_ADAAA).

170954

(*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-253, 101 S.Ct. 1089 [1981]). If an employer sets forth a nondiscriminatory reason for the employment action it took, the burden then shifts to the plaintiff to set forth sufficient evidence from which a jury could conclude that the proffered reason was a pretext (*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097 [2000]).

Under well-settled law, a plaintiff's burden of establishing a *prima facie* case of discrimination is "not a heavy one" and "one might characterize it as minimal" (*Carlton v. Mystic Transportation Inc.*, 202 F.3d 129, 134 [2d Cir. 2000]; *see also Luciano v. Olsten Corp.*, 110 F.3d 210, 215 [2d Cir. 1997] ["The plaintiff's burden of establishing a *prima facie* case of employment discrimination is 'not onerous'" quoting *Burdine*]). An employee must show that his employer is subject to the ADA, he is disabled within the meaning of the ADA, he was otherwise qualified for a position, and that there was an adverse employment action taken against the employee by reason of his disability (*Howell v. New Haven Board of Education*, 309 F.Supp.2d 286 [D. Conn. 2004]).

Direct evidence is not required to establish a *prima facie* case "because proof is seldom available with respect to an employer's mental process" (*Carlton v. Mystic Transportation Inc.*, 202 F.3d at 135). Plaintiffs must often rely on circumstantial evidence to establish a *prima facie* case (*Luciano v. Olsten Corp.*, 110 F.3d at 215 ["Direct evidence is not necessary, and a plaintiff charging discrimination against an employer is usually constrained to rely on the cumulative weight of circumstantial evidence"]). And, Courts have recognized that "employment discrimination is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence", and since it relies on a

170954

defendant's intent, "summary judgment is ordinarily inappropriate" (*Rosen v. Thornburgh*, 928 F.2d 528, 533 [2d Cir. 1991]).

### C.    *Plaintiff's* **Prima Facie** *Case*

Here, Ms. Primmer has demonstrated that in less than two months after she suffered a brain aneurysm, she was informed by her supervisor that her contract would not be renewed for the next season, and after her aneurysm was discussed, the reasons given for the non-renewal of plaintiff's contract was that CBS needed someone who could "handle the pressure" and who was physically "at the top of their game." In addition, prior to this time, plaintiff was never told her work performance was inadequate save the one time she was asked to resubmit her ideas after a pitch meeting, which she did.

The timing of plaintiff being told that her employment contract was not going to be renewed, the reasons given to Ms. Primmer for this decision, and that Ms. Primmer had adequately performed her job prior to her aneurysm gives an inference that Ms. Primmer's employment was terminated because CBS perceived that as a result of her aneurysm she was incapable of handling the stress of a job and that she was physically unable to perform her job responsibilities, when this was not the case. Accordingly, Ms. Primmer clearly met the minimal requirements of establishing a *prima facie* case of discrimination.

CBS contends that Ms. Primmer cannot make out a *prima facie* case that CBS perceived her to be disabled within the meaning of the ADA because CBS did not perceive her to be substantially limited in the major life activity of working. In so arguing, defendant relies on decisional authority which followed *Sutton v. United Air Lines* to argue that

- 18 -

170954

plaintiff cannot show that CBS believed Ms. Primmer could not perform a broad range of positions.

To the contrary, as set forth by Ms. Primmer, right after her aneurysm, Ms. Primmer was flat out told by Ms. Henry that her contract was not going to be renewed because CBS did not believe she was at the "top of her game" and did not believe she could "handle" a job with pressure. CBS did not limit its observation to Ms. Primmer's current position, nor, as was the case in the authorities defendant relies on, did CBS offer her a different position or indicate, by giving her a reference, that she could find employment elsewhere.

Accordingly, the context and the substance of these statements meet the minimal standard required to make out a *prima facie* case and a jury is permitted to draw an inference that CBS believed that because of her aneurysm, Ms. Primmer was too fragile to work (*Capobianco v. City of New York*, 422 F.3d 47, 60 [2d Cir. 2005] [summary judgment dismissing ADA claim reversed holding that there was an issue of fact as to whether employer considered plaintiff substantially limited in his ability to work]; *Medlin v. Rome Strip Steel Co.*, 294 F.Supp.2d 279, 290 [N.D.N.Y. 2003] [whether employer was motivated by a belief employee was substantially limited in working is rarely susceptible to resolution at the summary judgment stage]; *Stalter v. Board of Cooperative Educational Services Rockland County*, 235 F.Supp.2d 323 [S.D.N.Y. 2002]; *see also Rodriguez v. Conagra Grocery Products Company*, 436 F.3d 468 [5th Cir. 2006); *Hicks v. Tech Industries*, 512 F.Supp.2d 338 [W.D.Pa. 2007]).

170954

Further, there are numerous television productions and producer positions held

throughout the industry (*see* Exhibits 1 and 2 to the Affirmation of E. Christopher Murray,

dated July 22, 2009). Accordingly, like teachers and lawyers, television producers can be

deemed sufficiently broad to be deemed a class of jobs which, if CBS believed Ms. Primmer

was incapable of performing, would support a perceived to be disabled claim (*see Bartlett v.*

*New York State Board of Law Examiners*, 226 F.3d 69, 84 [2d Cir. 2000]; *Howell v. New*

*Haven Board of Education,* 309 F.Supp.2d 286 [D. Conn. 2004]). Accordingly, since the

statements by CBS, at a minimum, clearly raise the inference that CBS did not believe that

Ms. Primmer could handle the pressure of a television producer position as a result of her

aneurysm, a jury can determine that CBS violated the ADA, even under that statute's prior

language.

Finally, the authorities relied upon by defendant do not support the proposition

that, as a matter of law, CBS did not perceive Primmer as being disabled within the meaning

of the ADA prior to the recent amendments. For example, in *Pikoris v. Mount Sinai Medical*

*Center*, 2000 WL 702987 (S.D.N.Y 2000), the Court determine that the defendant-employer

did not consider the plaintiff as being unable to work generally as a result of her breast

cancer because, although her contract was not renewed, she was able to continue to work at

her position for eight months, and she was offered another position by the defendant. Here,

CBS never permitted Ms. Primmer to return to work after her aneurysm, and did not offer her

another position.

With regard to *Ryan v. Grace & Rybicki*, 135 F.3d 867 [2d Cir. 1998], the

Court found that because the employer wrote a favorable job recommendation, stated she

170954

was good at working with computers, and only referred to "this" job when stating that her colitis made her specific position too stressful, the employer could not be found to have perceived the plaintiff as disabled, *i.e.*, unable to work at a broad range of jobs. Here, CBS gave no indication that its comments were limited to a specific position, nor did it make any suggestion that it would help place plaintiff in a different position. It just made a blanket statement that her employment contract was not going to be renewed because CBS needed someone who was at the "top of their game" and could "handle the pressure".

If CBS is found to have perceived Ms. Primmer as generally incapable of working in a range of jobs "suitable for a person of her age, experience, and training" because of her perceived disability, or if the jury determines that CBS perceived Ms. Primmer as incapable of being employed as a television producer, plaintiff can sustain her claim. The statements and context in which they were given would permit this inference and Primmer has met her *de minimis* burden of establishing a *prima facie* case.

## POINT II

### MS. PRIMMER HAS SET FORTH EVIDENCE WHICH WOULD PERMIT A JURY TO DETERMINE THAT CBS' PROFFERED NON-DISCRIMINATORY REASON FOR NOT RENEWING HER CONTRACT WAS A PRETEXT

CBS contends that even if plaintiff had made out a *prima facie* case of discrimination, it has offered a legitimate nondiscriminatory reason for not renewing Ms. Primmer's contract. CBS contends that even before Ms. Primmer's aneurysm a decision was made to not renew her contract because of poor performance.

- 21 -

170954

Initially, it should be noted that evidence utilized to establish plaintiff's *prima*

*facie* case can be sufficient to also raise a triable issue as to whether the defendant's

proffered nondiscriminatory reason is a pretext (*Texas Dept of Community Affairs v. Burdine*,

450 U.S. 248, 101 S.Ct. 1089 [1981]).  Here, plaintiff was admittedly told that her contract

would not be renewed only **after** she had her brain aneurysm, and after discussing her brain

aneurysm CBS stated she was not being renewed because she was not "at the top of her

game" and was physically "unable to handle the pressure," not because of any perceived

performance issues.  These admissions clearly contradict the purported reason why Ms.

Primmer was not renewed.

Further, the lack of any significant documentary record of Ms. Primmer's

alleged shortcomings, the non-party testimony establishing that Ms. Primmer was performing

her job satisfactorily, and Ms. Primmer's own testimony refuting CBS' allegations that Ms.

Primmer was performing poorly, is evidence that CBS' proffered reason is a pretext.  And,

while defendant is correct that just because Ms. Primmer's assessment of her work

performance was different from those of her supervisors does not mean that the proffered

reason for her nonrenewal was a pretext, proof that plaintiff was performing her job

satisfactorily can be considered in determining whether a defendant's purported reason for its

job action was pretextual (*see, e.g., Byrnie v. Town of Cromwell Board of Education*, 243

F.3d 93, 103 [2d Cir. 2001] ["an employer's disregard or misjudgment of a plaintiff's job

qualifications may undermine the credibility of an employer's stated justification for an

employment decision"]).

- 22 -

170954

Similarly, the testimony of the CBS personnel who purportedly made the determination not to renew Ms. Primmer's contract are inconsistent, clearly undermining the CBS proffered reason for not renewing Ms. Primmer's employment contract and raising issues of credibility that can only be decided by the trier of fact. Here, Mr. Williams states that even during Ms. Primmer's first year, he was dissatisfied with Ms. Primmer's performance, and he told his executive producers to terminate Ms. Primmer in November 2006. However, none of the other CBS personnel seem to have any recollection of this dissatisfaction during Season 15 or this directive in November 2006 (Henry Tr. 18-19, 44; Forman-Brechka Tr. 19-20, 28). And, most tellingly, CBS hired her back for Season 16 with a substantial raise, and Mr. Williams' explanation that everyone is given a free pass their first year is demonstrably false, for example, Ms. Paredis.

As to when the decision to not renew was made, Mr. Williams states it was early in Season 16, and the other CBS executives state it was after the January 30th pitch meeting, even though they were going to work with Ms. Primmer, and nobody can point to any specific discussions other than to self-servingly assure that it was before Ms. Primmer's aneurysm. Further, as Ms. Henry testified, the decision whether to hire a producer back is at the end of the season – late April or early May (Henry Tr. 44-45).

And, as to the events at the pitch meeting and immediately thereafter, two other producers were terminated at that time, but Ms. Primmer was not; CBS admits that they were going to work with Ms. Primmer so she would improve; and Ms. Primmer admittedly revised and improved her pitch materials (Henry Tr. 41). In addition, Ms. Primmer contends that she was never told her job was in jeopardy or criticized after the January 30th pitch

170954

meeting; and Mr. Williams himself testified that he made decisions to terminate a producer, but later changed his mind, as he did with Mr. Lenant over the years (Williams Tr. 28).

Ms. Henry's specific testimony that the decision whether to bring a producer back is made at the end of the season – late April or early May – which would be after Ms. Primmer's aneurysm; the fact that Ms. Primmer was only told of the decision not to renew her contract after her aneurysm; CBS telling Ms. Primmer right after her aneurysm was discussed that CBS needed someone at the top of their game and who could handle the pressure; and the contradictory nature of the testimony given by the CBS representatives could permit a jury to reasonably determine that CBS' proffered reason why Primmer's contract was not renewed is a pretext. Accordingly, defendant's motion for summary judgment should be denied.

170954

## Conclusion

For the reasons set forth above and in the accompanying affidavit, defendant's

motion for summary judgment should be denied.


Dated:  Garden City, New York
        July 23, 2009

                                Respectfully submitted,

                                **REISMAN, PEIREZ & REISMAN, L.L.P.**

                                By:  _____
                                     E. Christopher Murray (CM-8980)
                                Attorneys for Plaintiff
                                1305 Franklin Avenue
                                PO Box 119
                                Garden City, New York  11530
                                (516) 746-7799