USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7-8-09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

ERIN PRIMMER,                                    :
                                                 :
                          Plaintiff,             :           08 Civ. 9422 (HB)
                                                 :
            -against-                            :           OPINION & ORDER
                                                 :
CBS STUDIOS, INC.,                               :
                                                 :
                          Defendant.             :
-----------------------------------------------------------------x

**Hon. HAROLD BAER, JR., United States District Judge:**

On November 3, 2008, Plaintiff Erin Primmer ("Primmer" or "Plaintiff") filed a Complaint against Defendant CBS Studios, Inc. ("CBS" or "Defendant") alleging that her employment as a television producer on the "Montel Williams Show" was terminated in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, New York State Executive Law § 296 ("NYSHRL") and the Administrative Code of the City of New York §§ 8-107.16, 8-107.73 and 8-107.15(a) ("NYCHRL"). Specifically, Primmer alleges that CBS terminated her employment based on discriminatory animus as a result of her having suffered a brain aneurysm in March 2007. CBS now moves for summary judgment on all of Primmer's claims. CBS has filed a concomitant motion to strike certain portions of the affidavits of Primmer and her attorney Christopher Murray, submitted in opposition to the motion for summary judgment, as well as certain portions of Primmer's Local Rule 56.1 Statement. For the reasons set forth below, Defendant's motions are denied.

## I. FACTUAL BACKGROUND[1]

Primmer began her employment as a Producer for the Montel Williams Show during Season 15 of the show in August 2005. Primmer was responsible for producing one one-hour show each week, which included "everything, from conception to completion" of the episode. Specifically, in carrying out her job duties, Primmer pitched show ideas for approval by Montel Williams ("Williams"), wrote the script for the show, wrote "pre-interview" notes that related to each guest so that Williams would be prepared to meet the guest on-the-air, briefed each guest, and briefed Williams as to what each guest would say on each show. In developing a pitch for a

---

[1] On summary judgment, all inferences must be drawn in favor on the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Accordingly, unless otherwise indicated, this section is based on Plaintiff's Response to Defendant's Rule 56.1 Statement.

show idea, Primmer was responsible for drafting a "focus," or an outline that defined the reason for the show, its relevance and what the show would entail. When Primmer was first hired, her supervisor was Executive Producer Diane Rappaport ("Rappaport"). In late 2005, Susan Henry ("Henry") and Kimberly Forman-Brechka ("Forman-Brechka") were promoted to Co-Executive Producers and replaced Rappaport as Primmer's direct supervisors. Although Williams had ultimate creative control over the content of the show and had creative input on each individual episode, during Season 16, CBS executive Alexandra Jewett ("Jewett") became involved in the creative aspects of the show.

CBS contends, based on the deposition testimony of Williams and others, that Primmer's work product during Season 15 was sub-par. *E.g.*, Defendant's Local Rule 56.1 Statement ("Def.'s 56.1 St.") ¶¶ 13-20. Primmer vehemently disputes these characterizations of her work, and attests that "at no time were any complaints with regard to [her] work performance communicated to [her]." Affidavit of Erin Primmer ("Primmer Aff.") ¶ 5; *see also id.* at ¶¶ 7-8. Indeed, by letter dated September 19, 2005, an executive in charge of production of the Montel Williams Show wrote on Primmer's behalf that "her prospects for continued employment and advancement are excellent." Primmer Aff. Ex. B. However, by May 2006, Primmer herself noted that it had "been a challenging year for [her] with [Forman-Brechka] and even with [Williams]." Declaration of Laura Sack ("Sack Decl.") Ex. J.

Ultimately, Primmer's contract was renewed for Season 16 with a 6% increase in salary. Under the contract, Primmer's employment was on a season-to-season basis, without a guarantee of continued employment for any subsequent season. Primmer understood that CBS was not obligated to offer her continued employment on any subsequent seasons of the Montel Williams Show. During the hiatus between Seasons 15 and 16, Williams and the executive producers denied Primmer's request for a promotion to Senior Producer for Season 16. Defendant contends that Williams and other producers continued to experience problems with Primmer's work performance during Season 16, *e.g.*, Def.'s 56.1 St. ¶¶ 38-46, 65, a fact Primmer vehemently disputes. *See* Primmer Aff. ¶¶ 12-13. Although CBS contends that Williams communicated to Henry that he wanted to terminate Primmer's employment as early as October 2006, Henry testified that she was not informed of the decision to terminate Primmer until approximately January 30, 2007. *See* Def.'s 56.1 St. ¶ 54; Deposition of Susan Henry ("Henry Dep.") 44:7-16.

On January 30, 2007, the producers of the Montel Williams Show participated in a pitch meeting to prepare for the February sweeps event. Each producer was asked to present fully-

fleshed out ideas at the meeting so that the February sweeps[2] could be planned out. Accordingly, each producer was expected to come to the meeting prepared to discuss topics and the data to support the topics. Primmer understood that, because CBS was scrutinizing the Montel Williams Show at the time, everyone was trying to "put their best foot forward" in their performance. After the January 30 meeting, Henry and Forman-Brechka warned Primmer that Williams was unhappy with her presentation at the meeting and that her ideas were not "up to par." Henry and Forman-Brechka further informed Primmer that they were dissatisfied because the ideas she had pitched at the meeting had not been as detailed as they had expected. At their request, Primmer submitted revised versions of the ideas she had presented at the meeting. While CBS contends that Primmer's work did not improve, Def.'s 56.1 St. ¶ 92, Primmer disputes this fact, attesting that it was her understanding that Henry and Forman-Brechka were satisfied with her performance after she submitted her revised thoughts.

CBS contends that Williams communicated his desire for Primmer's employment to be terminated immediately following the January 30 pitch meeting. Def.'s 56.1 St. ¶ 94. However, Primmer was not terminated at that time. CBS executives testified that the reason for their failure to terminate her at the time was that pursuant to her contract, if she were to be terminated before a certain date, CBS would be required to pay her out for a designated number of weeks, which the network was apparently unwilling to do. *See* Def.'s 56.1 St. ¶¶ 98-104. Accordingly, Primmer continued to work on the Montel Williams Show through the spring of 2007.

On March 29, 2007, Primmer suffered a brain aneurysm[3] and was rushed to the hospital for emergency surgery. After being released from the hospital two and a half weeks later, Primmer returned to the Montel Williams Show on several occasions, though she did not return to work full time as of yet because she had not yet been cleared to return. CBS continued to pay Primmer's salary through the end of Season 16 and did not deduct from her accrued vacation time for the time she was on leave. Primmer was cleared by her physicians to return to work by the beginning of Season 17. However, in May 2007, before Season 17 began, Henry called a meeting with

---

[2] November, February and May are "sweeps" months. During the sweeps event, advertising rates are set for the following period, so "shows generally try to put their best foot forward and get the highest ratings they can." Def.'s 56.1 St. ¶ 59-60. The higher a show's ratings during sweeps, the more advertising dollars it can attract.

[3] A cerebral aneurysm is a bulging weakness in the wall of an artery that supplies blood to the brain. In most cases, a cerebral aneurysm has no symptoms. In rare cases, the aneurysm can rupture, releasing blood into the skull and sometimes causing stroke. Such a rupture in a brain aneurysm is called a subarachnoid hemorrhage. Depending on the severity of the hemorrhage, brain damage or death may result. *See generally* Jonathan L. Brisman, M.D., et al., Cerebral Aneurysms, 355 NEW ENGL. J. MED. 928 (Aug. 31, 2006). In this case, there is no evidence in the record to show the extent or severity of Primmer's brain aneurysm.

Primmer. During that meeting, Henry and Primmer discussed Primmer's aneurysm, and Henry informed Primmer that they were sorry but they could not renew Primmer's contract for Season 17 because they needed "someone at the top of their game" and someone "who could handle the pressure." Primmer's employment therefore was terminated as of the end of Season 16. The Montel Williams Show was cancelled after Season 17.

## II. MOTION TO STRIKE

CBS has moved to strike certain paragraphs of Primmer's Response to its Local Rule 56.1 Statement and the affidavits of Primmer and Murray submitted in opposition to CBS's summary judgment motion. CBS offers various reasons for the referenced portions of the documents to be stricken, including that they contain legal argument and conclusory statements, are not based on personal knowledge, contain inadmissible hearsay, and/or contradict Primmer's previous deposition testimony. CBS also argues that Primmer's affidavit contains improper characterizations of evidence and makes unwarranted inferences from such evidence.

Defendant's motion to strike the referenced portions of Primmer's Response to its Rule 56.1 Statement based on her failure to support certain contentions with citation to the record or to specifically admit or deny certain assertions is denied. This Court has broad discretion to accept Primmer's 56.1 counterstatement, even if it does not comply strictly with the Rule's requirements. *See Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 155 n.2 (2d Cir. 2003); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (finding "while a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record," even where a party fails to comply with the local rules) (internal quotation marks and citations omitted).

With respect to the challenged portions of the affidavits, Rule 56(e) of the Federal Rules of Civil Procedure states that affidavits filed in connection with a summary judgment motion "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). Accordingly, "[a] court *may* . . . strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements." *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999) (emphasis added). However, nothing in the Federal Rules or the Local Rules of this District requires a court to strike such material. *See Sauerhaft v. Board of Educ. of the Hastings-on-*

4

*Hudson Union Free Sch. Dist.*, 05 Civ. 09087 (PGG), 2009 U.S. Dist. LEXIS 46196, at *29 (S.D.N.Y. June 2, 2009). Rather, the Court "may decline to conduct a line-by-line analysis and simply disregard" any material that does not comply with Rule 56(e). *Id.* at *30; *see also, e.g., LaSalle Bank Nat'l Ass'n v. Merrill Lynch Mortgage Lending, Inc.*, 04 Civ. 5452 (PKL), 2007 U.S. Dist. LEXIS 59303, at *17 (S.D.N.Y. Aug. 13, 2007); *Rus, Inc. v. Bay Indus., Inc.*, 322 F. Supp. 2d 302, 207 (S.D.N.Y. 2003). Moreover, to the extent Primmer's affidavit uses conclusory or argumentative language, the Court will not make the suggested inferences simply because Plaintiff has suggested them. *See Parks v. Lebhar-Friedman, Inc.*, No. 04-7133 (DCP) (KNF), 2008 U.S. Dist. LEXIS 63019, at *7 (S.D.N.Y. Aug. 11, 2008) ("[T]he court will not strike immaterial, verbose, conclusory, or evidentiary allegations unless their presence prejudices Defendant.") (citing *Federated Dep't Stores, Inc. v. Grinnell Corp.*, 287 F. Supp. 744, 747 (S.D.N.Y. 1968)). Accordingly, I will disregard any materials contained in the affidavits or Local Rule 56.1 Counterstatement that I find to be improper under the Federal Rules, if any, and Defendant's motion to strike such materials is denied.

### III.  MOTION FOR SUMMARY JUDGMENT

#### A.    Legal Standard

A motion for summary judgment must be granted if the moving party shows "there is no genuine issue as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In showing the existence of a genuine issue of material fact, "the non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *Golden Pac. Bancorp v. F.D.I.C.*, 375 F.3d 196, 200 (2d Cir. 2004). Rather, she "must come forward with evidence sufficient to allow a reasonable jury to find in her favor." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001); *see also* Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in [the] rule, . . . the adverse party's response . . . must set forth specific *facts* showing that there is a genuine issue for trial."). The facts presented must be in a form that would be admissible at trial.

5

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Even if the parties dispute material facts, summary judgment must be granted "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* It has oft been noted that courts should be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997); *see also Almond v. Westchester County Dep't of Corr.*, 425 F. Supp. 2d 394, 398 (S.D.N.Y. 2006). However, summary judgment in a discrimination case "may still be appropriate if the plaintiff relies on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." *Figueroa v. New York City Health & Hosps. Corp.*, 500 F. Supp. 2d 224, 228 (S.D.N.Y. 2007).

## IV. DISCUSSION

### A.   ADA Claim

Primmer's claim against CBS under the ADA arises out of allegations that CBS unlawfully discriminated against her due to a perceived disability. The ADA prohibits discrimination against a "qualified individual with a disability because of the disability" in, among other things, the "terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). Disability discrimination claims under the ADA are analyzed under the familiar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). To survive summary judgment under the *McDonnell Douglas* analysis, a plaintiff must first establish a *prima facie* case of discrimination based on disability by demonstrating that (1) her employer is subject to the ADA; (2) she was disabled within the meaning of the ADA; (3) she was qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered an adverse employment action because of her disability. *Giordano v. City of N.Y.*, 274 F.3d 740, 747 (2d Cir. 2001). To prove a prima facie case, i.e., these four prongs, the plaintiff's burden under *McDonnell Douglas* is "minimal." *Regional Econ. Cmty. Action Prog. v. City of Middletown*, 294 F.3d 35, 50 (2d Cir. 2002) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)). Once the plaintiff has shouldered its burden here, it is up to the defendant to come forward and to articulate a legitimate, nondiscriminatory purpose for having taken the adverse employment action. *E.g.*, *Sista*, 445 F.3d at 169. The defendant's burden in this regard is only one of production, not of persuasion. That is, the defendant need only articulate a nondiscriminatory

6

purpose supported by admissible evidence that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action; the defendant need not persuade the Court that the proffered purpose was in fact its reason for having taken the challenged employment action. See *Fisher v. Vassar College*, 114 F.3d 1332, 1335-36 (2d Cir. 1998) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). The plaintiff then has an opportunity to demonstrate that the defendant's proffered reasons were merely a pretext for discrimination. *E.g.*, *Sista*, 445 F.3d at 169. In showing a pretext, the plaintiff need only show that discrimination was "at least one of the motivating factors" in the employer's decision. *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). Throughout this analysis, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Rambacher v. Bemus Point Cent. Sch. Dist.*, 307 Fed. Appx. 541, 543 (2d Cir. 2009) (quoting *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004)).

*1. Prima Facie Claim*

CBS does not dispute that it is an employer covered by the ADA. Likewise, CBS does not dispute that Primmer was qualified to perform the essential functions of her job.[4] Accordingly, the only disputed elements of Primmer's *prima facie* claim are Elements 2 and 4 – that is, whether Primmer was "disabled" under the ADA and whether CBS chose not to renew her contract for an additional season on account of that disability.

***a. Was Primmer "Disabled" Under the ADA?***

Under the ADA, a "disability" is defined as (A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual, (B) a record of such impairment, or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2).[5] The

---

[4] CBS does note, in a footnote in its memorandum of law, that because it has contended that certain executives and superiors found Primmer's work product to be unsatisfactory, "the Court could readily conclude that she is unable to meet the third prong of her *prima facie* burden." However, CBS has given the Court no reason to find in its favor on this element of the *prima facie* case, and in any event, because the argument is made wholly in a footnote in its brief, the Court may choose to disregard it. *See In re Worldcom, Inc. Sec. Litig.*, 308 F. Supp. 2d 214, 231 n.24 (S.D.N.Y. 2004).

[5] In September 2008, Congress enacted the Americans with Disabilities Act Amendment Act of 2008 ("ADAAA"), which expanded the class of individuals who are entitled to protection under the definition of "disability" under the ADA. *See* Pub. L. No. 110-325, 122 Stat. 3553, 3554. As the Ninth Circuit recently explained, "[i]n the ADAAA, Congress emphasizes that when it enacted the ADA in 1990, it intended that the Act provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities and provide broad coverage." *Rohr v. Salt River Proj. Agric. Import & Power Dist.*, 555 F.3d 850, 853 (9th Cir. 2009). Accordingly, the ADAAA rejects the Supreme Court's narrow interpretation of the term "disability" in *Sutton v.*

existence of a disability must be determined on a "case-by-case" basis. *Capobianco v. City of N.Y.*, 422 F.3d 47, 56 (2d Cir. 2005) (citing *Toyota*, 534 U.S. at 198). In this case, Plaintiff's disability discrimination claim is premised on the third type of disability – that is, she claims that although she is not disabled, her claim falls within the purview of the ADA because CBS wrongly regarded her as being disabled.

A "regarded as" claim under the ADA "turns on the employer's perception of the employee and is therefore a question of intent, not whether the employee has a disability." *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 646 (2d Cir. 1998) (internal quotation marks and citation omitted). That is, "[a]n employer runs afoul of the ADA when it makes an employment decision based on a physical or mental impairment, real or imagined, that is regarded as substantially limiting a major life activity." *Sutton*, 527 U.S. at 490. It is not sufficient for a plaintiff to show that the employer perceived her as being "somehow disabled;" rather, the employer must regard the employee as "disabled within the meaning of the ADA." *Colwell*, 158 F.3d at 646 (emphasis omitted); *see also Roberts v. The Health Ass'n*, 308 Fed. Appx. 568, 570 (2d Cir. 2009); *Capobianco*, 422 F.3d at 57. Not every impairment is a "disability" within the meaning of the ADA; rather, the impairment must both limit a major life activity and the limitation must be substantial. *Capobianco*, 422 F.3d at 56. A "major life activity" is one that is "of central importance to daily life," including functions such as caring for oneself, walking, seeing, hearing, speaking, breathing, learning and working. *Id.*; *see also Toyota*, 534 U.S. at 197; 29 C.F.R. § 1630.2(i). To determine whether a major life activity is substantial and limiting, a court may look to several factors, including (1) the nature and severity of the impairment, (2) its duration or expected duration, and (3) the existence of any actual or expected permanent or long term impact. *Capobianco*, 422 F.3d at 57 (citing 29 C.F.R. § 1630.2(j)(2)).

_United Air Lines, Inc._, 527 U.S. 471 (1999) and _Toyota Motor Mfg., Ky., Inc. v. Williams_, 534 U.S. 184 (2002). The ADAAA expressly delayed its effective date until January 1, 2009, two months after Primmer filed her complaint in this matter. *Id.* § 8, 122 Stat. at 3559. Primmer acknowledges that all courts, in this Circuit and elsewhere, that have addressed the question of whether the ADAAA applies retroactively to claims filed before its effective date have answered in the negative. *See, e.g., Lytes v. DC Water & Sewer Auth.*, 572 F.3d 936 (D.C. Cir. 2009); *Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 567 (6th Cir. 2009); *Linder v. Potter*, No. CV-05-0062-FVS, 2009 U.S. Dist. LEXIS 72941, at *37 (E.D. Wash. Aug. 18, 2009); *Moen v. Genesee County Friend of the Court*, No. 2:08-cv-12824, 2009 U.S. Dist. LEXIS 57177, at *16 (E.D. Mich. July 6, 2009); *Guary v. Upstate Nat'l Bank*, 618 F. Supp. 2d 272, 275 n.1 (W.D.N.Y. 2009); *Fournier v. Payco Foods Corp.*, 611 F. Supp. 2d 120, 129 n.9 (D.P.R. 2009); *White v. Sears, Roebuck & Co.*, 07-CV-4286 (NGG) (MDG), 2009 U.S. Dist. LEXIS 35554, at *17-18 n.7 (E.D.N.Y. Apr. 27, 2009). Nonetheless, Primmer invites this Court to take the unprecedented approach of applying the broader definition of "disability" under the ADAAA to the instant case. This I decline to do. However, the question of whether the ADAAA applies retroactively is immaterial to this case because, as discussed in further detail below, I find that Primmer has raised a genuine issue of material fact as to whether CBS regarded her as disabled under the pre-ADAAA definition.

Where, as here, the major life activity in which a plaintiff alleges she was perceived to be substantially limited is working, the plaintiff must show that the employer perceived that she was "precluded from more than one type of job, a specialized job, or a particular job of choice." *Sutton*, 527 U.S. at 491. Rather, to prevail, Primmer must show that CBS regarded her as precluded from a broad class of jobs by virtue of her perceived disability. *Id.*; *Bartlett v. New York State Bd. of Law Examiners*, 226 F.3d 69, 82-83 (2d Cir. 2000).[6] That is, Primmer must do more than establish that CBS believed that she suffered from an impairment that prevented her from working in the job she previously had; she must show that CBS believed she was prevented from working a broad class of jobs.

In this case, drawing all inferences in favor of Primmer, as I must, I find that she has presented sufficient evidence to show that CBS regarded her as substantially limited in the major life activity of working. Primmer has presented facts that, shortly after her release from the hospital following her brain aneurysm, Henry called her into a meeting at which her aneurysm was discussed and Henry told her that they needed "someone at the top of their game" and someone "who could handle the pressure." Moreover, Primmer attests that, but for one incident, she was never advised that her performance was unsatisfactory by any of her superiors; and yet upon her return she was suddenly treated differently. Certainly this is evidence from which a jury could find that CBS believed her to be significantly restricted in her ability to work. *See Denardi v. DRA Imaging, P.C.*, 605 F. Supp. 2d 550, 555-56 (S.D.N.Y. 2009) (finding evidence illustrative of a significant change in the way defendants treated plaintiff after cancer treatment was sufficient for reasonable jury to find defendants believed plaintiff was disabled under the ADA).

Moreover, based on the undisputed facts surrounding Primmer's responsibilities as a producer on the Montel Williams Show, it does not appear that such a position entailed any great degree of specialized knowledge, training or expertise so that CBS perceived her only as being unable to work in her current position. That is, there is no reason why television production, or mass-media production, should not be regarded as a "broad class" of jobs such as being a teacher or a lawyer. CBS contends that Henry's comments during the May 2007 meeting with Primmer indicated only that Season 17 was expected to be critical and more stressful, and therefore, if

---

[6] The EEOC, the agency that bears the responsibility to implement specific provisions of the ADA, has promulgated regulations that define "substantially limits" where the activity is "working" as to "significantly restrict[] in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3); *see also Giordano*, 274 F.3d at 747-48.

9

anything, the comment reflected a belief that Primmer was unable to perform her specific role. To the contrary, Henry's comments contained no such limitations, and a reasonable jury could interpret them to mean that Primmer was viewed at CBS as someone who was unable to handle any position that involved stress. Further, unlike the cases cited by CBS, where the employer specifically referred to the plaintiff's inability to cope with a specific position, praised her skills, offered her a different position, or wrote her a recommendation to obtain other employment, in this case CBS did no such thing. *E.g.*, *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 872-73 (2d Cir. 1998); *Pikoris v. Mount Sinai Med. Ctr.*, 96 Civ. 1403 (JFK), 2000 U.S. Dist. LEXIS 7350, at *38-39 (S.D.N.Y. May 30, 2000); *cf. Howell v. New Haven Bd. of Educ.*, 309 F. Supp. 2d 286, 292 (D. Conn. 2004) (denying summary judgment on ADA claim even where "the fact that Howell was transferred to a teaching position at another school is powerful evidence that the Board of Education did *not* perceive Howell as disabled within the meaning of the ADA") (emphasis added). Accordingly, Primmer has raised a genuine issue of material fact as to whether CBS regarded her as disabled under the ADA.

### b. Did Primmer Raise an Inference of Discriminatory Intent?

To satisfy her burden on the fourth prong of her *prima facie* claim, Primmer must show that she was terminated under circumstances that give rise to an inference of discriminatory intent. *E.g.*, *Denardi*, 605 F. Supp. 2d at 555 (citing *Debidat v. Marriott Int'l, Inc.*, 580 F. Supp. 2d 300, 305 (S.D.N.Y. 2008)); *see also Holcomb*, 521 F.3d at 139. Drawing all permissible factual inferences in plaintiff's favor, I find that the evidence adduced by Primmer passes the test.

CBS contends that the record shows Williams made his decision that Primmer's contract would not be renewed as of the fall of 2006, or alternatively, after the January 30, 2007 pitch meeting. CBS maintains that Primmer was not let go at that time because the cost of paying her out under her contract would have been too great and that she was needed during February sweeps. In short, CBS claims that because it had already decided not to renew Primmer's employment contract before the aneurysm, it could not have made that decision as a result of the aneurysm. However, Primmer has raised genuine issues of material fact as to when CBS in fact decided to terminate her employment. Specifically, as noted above, Primmer notes that other than on one occasion, she was never advised that her performance was unsatisfactory or that her continued employment was in jeopardy. Indeed, on that one occasion – following the January 30 pitch meeting – Primmer revised her pitch presentation and was never advised that it remained

10

unsatisfactory in any way.[7]  Further, although Williams testified that he began to feel disappointed with Primmer's performance during Season 15, Primmer's contract nonetheless was renewed for Season 16 with a 6% salary increase.  Moreover, the record in this case is absolutely devoid of any contemporaneous writings – be they internal memoranda, emails or diary entries – that show any indication that any of Primmer's direct supervisors was dissatisfied with her performance prior to her aneurysm.[8]  On the other hand, Henry's comments at the May 2007 meeting, or what might better be characterized as an exit interview, about her aneurysm and that they needed "someone at the top of their game" and someone "who could handle the pressure" certainly allows a reasonable jury to decide that the decision not to renew Primmer's contract was motivated, at least in part, on her perceived disability, especially given the relatively close proximity between Primmer's return to the office following her recovery from the aneurysm and her meeting with Henry.  *See, e.g.*, *Droutman v. New York Blood Ctr., Inc.*, 03-CV-5384, 2005 U.S. Dist. LEXIS 42951, at *15 (E.D.N.Y. July 27, 2005) ("The temporal proximity of an employee's disclosure of a disability and her termination helps support an inference of disability discrimination.").  In short, Primmer has raised a genuine issue of material fact as to whether CBS chose not to renew her contract on account of her perceived disability.

---

[7] One of Defendant's primary objections to Primmer's attempt to raise issues of fact is that such attempt is based in large measure on her own "self-serving" affidavit.  However, precedent in this Circuit makes clear that certain uncorroborated affidavits by the non-moving party, standing alone, may be sufficient to create a genuine issue of material fact sufficient to survive summary judgment in a discrimination case.  As the Second Circuit has held:

> [i]n discrimination cases, the only direct evidence available very often centers on what the defendant allegedly said or did. . . Since the defendant will rarely admit to having said or done what is alleged . . . the issue frequently becomes one of assessing the credibility of the parties.  At summary judgment, however, that issue is necessarily resolved in favor of the nonmovant.  To hold, as defendants ask us to do, that the nonmovant's allegations of fact are (because "self-serving") insufficient to fend off summary judgment would be to thrust the courts – at an inappropriate stage – into an adjudication of the merits.  Such a radical change in the courts' role would be inappropriate not just in the discrimination context, but everywhere.

*See, e.g., Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998); *see also Jenkins v. Area Cooperative Educ. Servs.*, 248 F. Supp. 2d 117, 126-27 (D. Conn. 2003); *Upper Hudson Planned Parenthood, Inc. v. Doe*, 90-CV-1084, 1999 U.S. Dist. LEXIS 6263, at *14 (N.D.N.Y. Apr. 28, 1999).

[8] There is one memorandum dated February 1, 2007 from Erik Sulcs, Supervising Field Producer, to Henry and Forman-Brechka, that relays the complaints of Jen Madden, a Field Producer, relating to Primmer's performance on a particular segment or episode.  *See* Sack Decl. Ex. M.  However, beside the fact that this document contains several levels of hearsay, there is no indication that these complaints were ever imparted to Primmer, or that Henry or Forman-Brechka shared Madden's views or took any action on them.

11

## 2. *Legitimate Non-Discriminatory Purpose*

Primmer having satisfied her burden on the first prong of the *McDonnell Douglas* analysis, the burden of going forward shifts to CBS to articulate a legitimate nondiscriminatory purpose for its decision not to renew Primmer's employment contract for Season 17 of the Montel Williams Show. CBS indisputably has shouldered this minor burden by showing that Primmer's employment contract was not renewed because her performance was below expectations and unsatisfactory to her supervisors and to Williams. Even Primmer does not dispute that her unsatisfactory job performance, if true, would be a legitimate nondiscriminatory reason for CBS to choose not to renew her contract. Accordingly, no more need be said on this prong of the analysis, and the burden now shifts back to Primmer to show that this proffered reason is merely a pretext for discriminatory animus based on her perceived disability.

### 3. *Pretext*

A plaintiff alleging employment discrimination may show pretext where "the employer's given legitimate reason is unworthy of credence," *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1113 (2d Cir. 1988), "by reliance on the evidence comprising the prima facie case, without more," *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 28 (2d Cir. 1994), or "by demonstrating that similarly situated employees outside the protected class were treated differently." *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 249 (S.D.N.Y. 2001). An employment discrimination plaintiff may also demonstrate pretext by showing "such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Droutman*, 2005 U.S. Dist. LEXIS 42951 at *25 (citation omitted).

In this case, all the same evidence that raised factual issues with respect to Primmer's *prima facie* case apply equally to raise a genuine issue of material fact as to whether CBS's proffered reasons for terminating her employment were pretextual. To wit, the lack of evidence of any poor performance evaluations during Primmer's employment history, lack of prior notice of underperformance, the renewal of Primmer's contract with a 6% salary increase after Williams purportedly began to experience disappointment with Primmer's work product, and the fact that Primmer was first alerted to the fact that her contract would not be renewed at a meeting with Henry in which Henry made comments that were fairly traceable to her perceived disability,

combined with the proximity of her termination as compared to her return to work after her aneurysm, taken together are sufficient to raise a genuine issue of material fact with respect to discriminatory animus.

\* \* \*

At its core, this case paints the classic he-said/she-said scenario, which involves an assessment of credibility and the resolution of competing inferences from the disputed facts. Neither is for the Court to decide. Accordingly, summary judgment on Primmer's ADA claim must be denied. *See Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 155 (2d Cir. 1998) ("To the extent these inconsistencies [between plaintiff's and defendant's version of events] can only be resolved based upon credibility determinations, such questions of witness credibility are to be decided by the jury."); *Rodriguez v. City of N.Y.*, 72 F.3d 1051, 1061 (2d Cir. 1995) ("On a summary judgment motion, the court is not to weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact.").

## B.     NYSHRL and NYCHRL Claims

Like the ADA, both the NYSHRL and NYCHRL forbid employers to discharge or change the conditions of employment of an employee because of a disability. *See* N.Y. Exec. L. § 296(1)(a); N.Y.C. Admin. Code § 8-107(1)(a). The only major difference in the analysis of disability discrimination under the state and city statutes as compared to the ADA is that the definition of disability under the former is considerably broader than the ADA definition, at least before the amendments of 2008. *See, e.g., Denardi*, 605 F. Supp. 2d at 557. NYSHRL and NYCHRL claims are analyzed under the same *McDonnell Douglas* framework as ADA. *Ferraro v. Kellwood Co.*, 440 F.3d 96, 99-100 (2d Cir. 2006). Therefore, the same analysis of Primmer's claims for discrimination based on a perceived disability apply equally to her claims under the NYSHRL and NYCHRL, and summary judgment on those claims must be denied for all the same reasons discussed above.

## IV. CONCLUSION

Defendant's motion for summary judgment is DENIED. Defendant's motion to strike is also DENIED. This matter will go forward to trial on all of Primmer's claims as scheduled in November 2009. A trial notification setting forth a date certain for trial and the deadlines for submission of pretrial materials will be transmitted to the parties in due course. The Clerk of this

13

Court is directed to close these motions (Docket Nos. 18 and 26) and remove them from my docket.

**IT IS SO ORDERED.**

**New York, New York**
**September 7, 2009**

_____
U.S.D.J.